Pagliarulo, Appellant, *v.* Lippolis.

Argued April 20, 1934.

54

Before Trexler, P. J., Keller, Baldrige, Stadtfeld, Parker and James, JJ.

*Carroll Caruthers,* and with him *Andrew G. Uncapher,* for appellant.

*I. A. Swiss,* and with him *Richard D. Laird* and *Wm. M. Kahanowitz,* for appellee.

Opinion by Stadtfeld, J., July 13, 1934:

This is an action in assumpsit originally brought by John Pagliarulo against Steel Workers Relief Association for money alleged to be due him as beneficiary on an insurance certificate insuring the life of Vito Lippolis. The Steel Workers Relief Association filed a petition admitting liability, but alleging that a claim had been made to the same insurance money by Thomas Lippolis, a brother of the assured, whose name appeared as beneficiary on the insurance certificate and praying the court for leave to pay the money into court and an order directing the adverse claimants to interplead. The court granted the interpleader and ordered a feigned issue to be framed with John Pagliarulo as plaintiff and Thomas Lippolis as defendant.

Similar actions were filed by John Pagliarulo against the Missouri State Life Insurance Company and the Equitable Life Assurance Society resulting in similar interpleaders and feigned issues.

By agreement of counsel, the three cases were tried together before a judge and a jury.

Vito Lippolis died November 26, 1928 at the Mont Alto Sanitarium, Mont Alto, Pennsylvania, leaving three insurance policies with the following companies and in the following amounts: The Steel Workers Relief Association in the sum of $1,678, dated October 1, 1925; The Missouri State Life Insurance Company in the sum of $1,000, dated August 1, 1926; and The Equitable Life Assurance Society in the sum of $1,-016.62, dated May 20, 1925. In all three policies the named beneficiary is Thomas Lippolis, a brother of the assured. On the death of assured claims for the proceeds of these policies were filed both by the brother, Thomas Lippolis, and by one John Pagliarulo, appellant, an alleged new beneficiary.

The following facts were established on the trial of the case: The assured entered the Mont Alto Sanitarium on April 24, 1928, suffering from a far advanced stage of pulmonary tuberculosis. On the fifth day of May he was transferred to the infirmary because his death was expected in a very short time, probably a few weeks up to a few months. On November 18, the patient was removed to a sideroom, the idea being to prevent the depressing effect of having patients die before other patients.

On November 1, 1928, the patient was administered morphine for the first time. From that day until the day of his death, November 26th, morphine was administered to him daily. On November 25th, the day on which the alleged changes of beneficiary were signed, at about 11 o'clock A. M., four doses were administered the patient, one

dose containing one-fourth grain of morphine being given the patient at 9:30 or at 9:50 A. M. One-fourth of a grain of morphine is considered the maximum dose. It has the tendency of making the patient sleepy or drowsy for a period from four to six hours and he would feel the maximum effect in half an hour.

On November 24, the temperature of the patient dropped to 96 2/5 which indicated "impending death," a condition of collapse. At the time the assured signed these alleged changes of beneficiary, he was propped up in bed, gasping for breath, blue in the face.

Father O'Hanrahan, in charge of the Catholic patients of the Mont Alto Sanitarium, was called on November 19, to administer to the assured the last rites of the church. He found him a very sick man "just like a statue" ...... "Too sick to receive communion." He administered the rites conditionally, leaving word with the nurse that if patient's condition improved to call him back. He was not called back.

The blanks for change of beneficiary were procured by the alleged new beneficiary, this being done, as the latter testified on cross-examination, at the request of the assured. He filled in the blanks, putting in his own name, the word "friend," the date and place.

According to the testimony of George F. Householder, one of the attesting witnesses to the papers changing the beneficiary, the papers were handed to decedent by John Pagliarulo, appellant, as also the pen with which to sign; the papers were not read to decedent before signing, nor anything said to him; it took two or three strokes before he got it signed.

The evidence discloses that the relations between decedent and his brother were friendly; that decedent visited his brother once or twice a week; decedent left a brother and sister in Italy, sent money to the old country, to his father two or four times a year; the decedent was on friendly terms with his brother and

father and sister in Italy to the day of his death; the assured was god-father to one of the children of his brother and intended to pay for the education of another; decedent and John Pagliarulo were not of kin.

It also appeared from the testimony that the assured reposed trust and confidence in John Pagliarulo; he trusted him with the key to his bank vault and bank checks in blank; and had him pay his garage rent and premium of life insurance with money furnished by the assured.

Requests for binding instructions on each side were refused.

The case was submitted to the jury in a full, fair and comprehensive charge, wherein the court, after reviewing the various contentions of each side, instructed the jury: "Where an alleged substituted beneficiary claims the proceeds of a policy of insurance, naturally the burden of proof is upon him to establish his right to the insurance money as against the beneficiary named in the policy. The plaintiff must 'tip the scales' in his favor or the money should go to the beneficiary named in the policy. ...... Now that change of beneficiary ought to stand, naturally, if it wasn't procured by undue influence, if it wasn't procured by reason of confidential relationship. And it ought to stand if he was mentally sound, knew what he was doing."

The court instructed the jury that the assured had a right to make a change in beneficiary, and practically told them that there was no evidence of any facts that would justify a conclusion of undue influence. On the question of confidential relationship the court instructed the jury: "When a relationship of confidence is established by the evidence, fairly and justifiably established, then there is a burden placed upon that one in the confidential relation, if he hopes to receive benefits of any transaction between them, then he must

establish, and the burden is upon him to establish, as we have said, that there was no deception used, that the act was an intelligent and well understood act and was a free act. If he does that, notwithstanding there may be a confidential relationship, there would be nothing about it, and he ought to have the benefit of the transaction done in such a manner.''

On the question of mental capacity, the court instructed the jury: "N,ow, disability of body, sickness, old age, inability to really transact business, physical weakness, in themselves, do not raise a presumption of incapacity because after all it is want of mental capacity that affects transactions, and capacity relates to the soundness of mind or mind that has full and intelligent perception and understanding of his acts. We well know from observation perhaps from some experience that a man may have mental capacity although he be weak in body, although he be of old age. You also well know that an idiot or lunatic, or loss of understanding due to disease or drugs—where there be unconsciousness, that affects all transactions and makes them void in law. This matter of old age and physical weakness over long period of sickness, is an important matter for consideration. In itself though it means nothing unless you can see by reason of old age, drugs or what not, that at the time this change of beneficiary was made, he didn't have understanding, he didn't have mental capacity, he didn't really know the force and effect of the acts he did.''

The jury rendered a verdict in favor of the brother, defendant in the issue. Motions for new trial and judgment non obstante veredicto were overruled in an opinion by Dom, J. From the judgment entered on the verdict this appeal was taken.

Appellant contends that there was not sufficient evidence on which to submit any question affecting the validity of the change of beneficiary, and that there was not sufficient evidence to sustain the verdict.

After a careful reading of the entire testimony, we are satisfied that the request for binding instructions and for judgment n. o. v. could not have been granted.

Appellant, in his statement of question involved, suggests that when defendant called plaintiff for cross-examination, and did not produce witnesses to qualify or contradict him, that he was bound by his testimony. There is no assignment of error which raises this question. Nevertheless, we do not think there is any merit in this contention. As stated in Schade v. Detar, 102 Pa. Superior Ct. 418, 421: "It is settled by an unbroken line of decisions in this State that where a party calls his opponent for cross-examination, he is not concluded by his testimony but may offer witnesses to qualify or contradict it; if he does not do so, he becomes bound by that testimony." The testimony of this witness on cross-examination was not conclusive of the issue but had to be considered in connection with the testimony of the other witnesses called by defendant. Plaintiff testified, on cross-examination, that decedent knew what he was doing when he signed the paper. The testimony of the other witnesses who testified as to the condition of the patient, mentally and physically, made this a question of fact for the jury.

The case was submitted in a charge as favorable to plaintiff as the latter could have asked. The verdict is fully sustained by the evidence.

The assignments of error are overruled and judgment affirmed.